UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

QUALITY DOOR & HARDWARE, INC.,

                          Plaintiff,

        -against-

STANLEY SECURITY SOLUTIONS, INC.,

                       Defendant.
-------------------------------------------------------------------X

**MEMORANDUM
AND ORDER
CV 15-6280 (ARL)**

**LINDSAY, Magistrate Judge:**

Before the Court is the motion of the defendant, Stanley Security Solutions, Inc. ("Stanley"), for summary judgment pursuant to Federal Rule of Civil Procedure 56.   The Court is also in receipt of several motions in limine from the parties, some of which relate to the arguments raised in the summary judgment submissions.   For the reasons set forth below, Stanley's motion for summary judgment is granted.

## BACKGROUND

The Court assumes the parties' familiarity with the facts and procedural history of this case and will not completely repeat them in this order.   Instead, what follows is an abbreviated account of the procedural history and relevant facts to provide some context for this decision.

**A.**    **Procedural History**

On September 24, 2015, Quality commenced this action in Suffolk County Supreme Court asserting claims against Stanley for fraud/breach of contract and the implied covenant of good faith and fair dealing.   The case was removed to this Court on November 2, 2015.   On April 22, 2019, this Court issued a decision denying Quality's motion for partial summary judgment and granting, in part, Stanley's motion for summary judgment.   ECF No. 94.   With

respect to Quality's motion, the undersigned found that there was a question of fact as to whether the Letters of Supply, from which Quality's claims stem, were authorized.   The Court also held that Quality could not rely on Stanley's sale of certain assets to Dormakaba Holding AG d/b/a Dormakaba USA Inc. ("Dormakaba") as evidence of the breach since Quality had failed to timely move to amend its complaint.

With respect to Stanley's motion for summary judgment, the Court dismissed Quality's first cause of action to the extent it was based upon fraud and second cause of action sounding in breach of the implied covenant of good faith and fair dealing,   In addition, the Court narrowed Quality's remaining breach of contract claim, finding that there was no evidence to support Quality's claim based on the "withdrawal of assistance and support" by Stanley.   Notably, the Court also held that the Letters of Supply were not stand alone contracts, and therefore, could not independently support Quality's claim for breach of contract.   Nonetheless, the Court denied Stanley's motion on that ground because a document in the summary judgment record suggested that Stanley may have viewed the Letters of Supply as part of the parties' Dealer Purchase Agreement ("DPA"), which will be discussed in further detail below.   In sum, following the summary judgment ruling, the only remaining claim in this case was a single breach of contract claim based on Stanley's alleged requirement to provide an uninterrupted source of supply for Quality's Schedule 56 and Schedule 84 General Services Administration (GSA) contracts.

On August 8, 2019, Quality filed a second lawsuit this time against both Stanley and Dormakaba asserting another combined "Fraud and Breach of Contract" claim, alleging that Stanley misrepresented that (i) Quality's Letters of Supply were assigned to Dormakaba, (ii) Stanley's own GSA contract was assigned to Dormakaba and (iii) Quality could purchase supplies from Dormakaba needed to fulfill its GSA obligations.   Quality also claimed that

2

Stanley breached the contract by selling its assets to Dormakaba without first assigning the Letters of Supply.   Finally, the 2019 lawsuit contained a successor in interest and civil conspiracy claim based on the same facts.

In June 2023, Stanley filed a letter with District Judge Gonzalez, who had been assigned to the 2019 action, indicating its desire to file a summary judgment motion in that case.   After the premotion conference letter and the anticipated motion were referred to the undersigned, Quality confirmed that it was willing to voluntarily discontinue the 2019 action, provided it would be permitted to argue in the 2015 case that Stanley's sale of a portion of its business to Dormakaba was a breach of the Letters of Supply causing it to suffer further damages.   Stanley did not object and the Court agreed.   As such, following the discontinuance of the 2019 action, the remaining claim before the Court was still a single breach of contract claim based on Stanley's alleged failure to provide an uninterrupted supply of goods as set forth in the Letters of Supply.   However, the Court made clear that Quality would also be permitted to raise the sale of assets to Dormakaba as further evidence of that alleged breach.

### B.   Relevant Factual Background

Quality is a New York corporation that resells commercial door hardware products, metal and wood doors, and door frames.[1]   Def.'s Rule 56.1 Stmt. ¶ 1.   Stanley was an Indiana corporation that manufactured commercial door hardware products during the time periods referenced in Quality's complaint.   *Id.* ¶ 2.   On January 1, 2011, Quality and Stanley entered into the above referenced DPA, which was renewed in 2012, 2013, 2014, and 2015.   *Id.* ¶ 3; Pl.'s Rule 56.1 Stmt. ¶ 3.   The DPA contains the following relevant provisions:

Section I .I. Non-Exclusive Authorized Contract Construction Dealer. Stanley

---

[1] The following facts are drawn from Stanley's Local Rule 56.1(a) Statement and are uncontested unless otherwise noted.

hereby appoints [Quality] as Stanley's non-exclusive Dealer for Stanley's Products within the Contract Construction Market and the Territory[2] on the terms and conditions contained in this Agreement.

Section 1.3. Dealer Territory. . .. [Quality] is not permitted to sell Stanley's Products outside the Territory without the express written consent of Stanley.

Section 1.5. Dealer Tiering Program.   [Quality] will be eligible for Stanley's Dealer Tiering Program. This Tiering Program provides discounts and other benefits to [Quality] based on the sales results generated in the previous calendar year.[3]

Section 1.7. Stanley's Products and Prices. . ..   Stanley may, in its sole discretion, change or amend the discounted prices established by Stanley; add products to or remove products from, and/or change or amend terms and conditions of sale as contained in, its catalogs, price list or published sales policies; or publish a revised price list, catalog or sales policy from time to time.

Section 3.1. Term of the Agreement. Unless terminated earlier under Section 3.2 of this Agreement, this Agreement shall remain in force and effect from the Effective Date hereof to December 31, 2010.[4] Thereafter, this Agreement shall automatically renew for successive one (1) year periods, unless Stanley gives Dealer written notice of termination not less than thirty (30) days before the end of any term of this Agreement.

Section 3.2 Termination. Unless terminated earlier under Section 3.1 of this Agreement, this Agreement may be terminated by either party, without cause, by providing thirty (30) days written notice to the other party. . ..

Section 5.4. Limitation of Liability.   It is expressly agreed that under no circumstances shall Stanley be held liable for any incidental, special or consequential damages, including, but not limited to, loss of profits, whether arising under alleged breach of Agreement, negligence, strict liability, or any other legal or equitable theory.

---

[2]   The Territory is defined as New York Counties of Dutchess, Nassau, New York City (including boroughs of Bronx, Kings, Queens, New York and Richmond), Orange, Putnam, Rockland, Suffolk, Sullivan, Ulster and Westchester. New Jersey Counties of Bergen, Essex, Hudson, Hunterdon, Middlesex, Monmouth, Morris, Passaic, Somerset, Sussex, Union and Warren.   Crowley Decl. Ex. D.
[3]   It is undisputed that to the extent that Quality received additional discounts greater than under the DPA for a particular bid on a project, those discounts were completely discretionary.   Def.'s Rule 56.1 Stmt. ¶ 10.   Nor was there any obligation on the part of Stanley to provide an additional discount to Quality beyond that of their standard DPA discount.   *Id.*
[4]   The Court assumes the 2010 was a typographical error and was intended to be 2011.

4

Crowley Decl. Ex. D.

In February 2012, Quality began the process of applying to GSA to obtain two Multiple

Awards Schedule Contracts, one under Schedule 56 and the other under Schedule 84.   Def.'s

Rule 56.1 Stmt. ¶ 12.   Pursuant to I-FSS-644, prior to being awarded a GSA Contract, an offeror

is required to submit to the government either (1) a letter of commitment from [a] manufacturer

which will assure the offeror of a source of supply sufficient to satisfy the Government's

requirements for the contract period, or (2) evidence that the offeror will have an uninterrupted

source of supply from which to satisfy the Government's requirements for the contract period.

*Id*. ¶ 13.   In order to satisfy this regulation, Quality produced eighteen Letters of Supply from

manufacturers containing similar, if not identical, format and language mirroring the GSA

template, although 99% of the material it ultimately sold was produced by Stanley.   *Id*. ¶ 16;

Pl.'s Rule 56.1 Stmt. ¶ 16.

In any case, on March 28, 2012, Stanley provided Quality with a Letter of Supply but it

could not be used because it was missing some required information and referred to the Schedule

84 contract, not the Schedule 56 contract for which Quality was first seeking to apply.   Pl.'s

Rule 56.1 Stmt. ¶ 15.   Stanley then provided Quality with two additional Letters of Supply dated

June 1 and August 17, 2012.[5]  Def.'s Rule 56.1 Stmt. ¶ 15.   Approximately one year later,

Quality was awarded GSA Contract GS-07-322AA for Schedule 56 with an effective date of

June 12, 2013 and approximately two years later, GSA Contract GS-07-259BA for Schedule 84

with an effective date of August 1, 2014.   Def.'s Rule 56.1 Stmt. ¶ 21.   Once Quality was

---

[5] The June and August Letters of Supply were not prepared by Stanley directly, but were prepared by Eric Weinstein ("Weinstein") of Architectural Opening, Inc., a company that had from time to time represented Stanley. See ECF No. 94.   Throughout this lawsuit, Stanley has maintained that Weinstein was not authorized to issue the June and August Letters on Stanley's behalf.   However, Stanley's Rule 56.1 Statement of Undisputed Facts provides that, at least for the purposes of this motion, it is conceding that the Letters were authorized, thus, removing one of the questions of fact identified by the Court in the prior decision.

awarded the GSA Contracts, it was allowed to list products manufactured by Stanley for re-sale on the GSA Advantage Website and to bid on government projects posted on that same website. *Id*. ¶¶ 22, 23.

Importantly, the GSA Contracts obtained by Quality did not place any standing obligation on Quality to supply any specific amount of Stanley product to the U.S. government or any government related entities, at any point in time.   *Id*. ¶ 24.   Similarly, the GSA Contracts obtained by Quality did not place any standing obligation on the U.S. government or any government related entities, to purchase any amount of Stanley product from Quality at any point in time.   Def.'s Rule 56.1 Stmt. ¶ 25.   Rather, Quality's obligation was simply to guarantee an uninterrupted supply of "product," not necessarily Stanley's product, whenever called upon by the government to deliver under the GSA contracts.   Pl.'s Rule 56.1 Stmt. ¶ 24.

According to the invoices produced by Quality during discovery, Quality purchased product from Stanley in 2014 and 2015 and re-sold a portion of that product through its GSA contracts.   Crowley Decl. Exs. N and O.   However, on December 4, 2015, the DPA was terminated by Stanley, in writing, by way of a letter from Stanley's V.P. of Sales North America, Jason Pulliam ("Pulliam").   Def.'s Rule 56.1 Stmt. ¶ 11.   Following the termination, Quality never attempted to buy any additional product directly from Stanley or Dormakaba but still bought Stanley Best Products through a wholesale distributor and sold them under Quality's GSA contracts.   *Id*. ¶ 26 ; Crowley Decl. Ex. R at 156:8-24.   Quality claims it did so because it no longer had an ability to offer Stanley's products on the GSA contracts or to purchase Stanley products wholesale and resell under those contracts.   Pl.'s Rule 56.1 Stmt. ¶ 26.   Yet, it is undisputed that at no point in time did Stanley refuse to sell Stanley product to Quality.   Def.'s Rule 56.1 Stmt. ¶ 27.   In point of fact, the termination letter made clear that Stanley would

6

continue to sell product to Quality but at its then-current list price.   *Id.*   Specifically, Pullium stated:

> Please note Stanley will agree to continue to sell and ship product to Quality
> with respect to Quality's bona fide, documented GSA contract commitments in
> support of the previously issued Letters of Supply dated June 1, 2012 and
> March 28, 2012, up until the first expiration of each of Quality's GSA
> contracts.   Any such sales shall be made at Stanley's then-current list price,
> and payment terms for such orders and sales shall be cash in advance.   Quality
> will need to validate that such orders are being placed pursuant to their GSA
> contract.

Crowley Decl. Ex. E.[6]

Indeed, Jeffrey Dinardo ("Dinardo"), the President of Quality, testified at his deposition, that following the termination of the DPA, Quality was able to purchase as much Stanley product as it wanted, but it did not do so because it was less profitable.   Def.'s Rule 56.1 Stmt. ¶ 28; Crowley Decl. Ex. R, 29:8-30:22, 159:2-15, 161:16-20.   In fact, Quality has formally withdrawn its claim that following the termination of the DPA, Quality was unable to obtain the products it previously purchased from Stanley.   Def.'s Rule 56.1 Stmt. ¶ 29.

On December 20, 2016, a portion of Stanley's business was sold to Dormakaba.   *Id.* ¶ 30. Although Quality complains that the failure to assign its Letters of Supply to Dormakaba was in direct contravention of Stanley's promise to continue to sell and ship it product, Stanley contends that Quality was not impacted by this sale as evidenced by the fact that it was offering Stanley products for sale to the government up until at least October 13, 2017, almost ten months after the sale.   *Id.* ¶ 31.   Quality claims it removed all of Stanley's products from its GSA contract

---

[6] Quality attempts to dispute the clear language in the termination letter by pointing to a letter it received from Bill Conaway of Stanley, which requested that Quality remove all Stanley products from their GSA schedule within thirty days.   Crowley Decl. Ex. M. However, upon receipt of that letter, Quality objected and the parties held a conference call to address the situation.   *Id.* at Ex. A at ¶¶ 28-9.   During the conference call, Stanley's legal counsel promised that Stanley was not terminating the DPA at that time, nor would Stanley require Plaintiff to remove all of Stanley's products from its GSA schedule.   *Id.* at Ex. A at ¶ 29.

offerings in October 2016.   Pl.'s Rule 56.1 Stmt. ¶ 31.   While the parties disagree as to whether

Stanley products were being sold after the sale to Dormakaba, the evidence in the record is,

nonetheless, clear that Quality was offering Stanley products for sale after the DPA had been

terminated.   In fact, Quality still offers products from the Stanley, Best, and Dormakaba product

lines for sale on its own website (www.qualitydoor.com) although it complains that it is unable

to offer competitive pricing for these products due to Stanley's refusal to sell to Quality.   Def.'s

Rule 56.1 Stmt. ¶ 32; Pl.'s Rule 56.1 Stmt. ¶ 32.

## DISCUSSION

### A.   Standards of Law

Summary judgment is proper only "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ.

P. 56(a).   "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return

a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit

under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).   In determining whether an issue is

genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory

answers, and depositions must be viewed in the light most favorable to the party opposing the

motion."   *Cronin v. Aetna Life Ins. Co*., 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v.

Diebold, Inc*., 369 U.S. 654, 655 (1962) (*per curiam)); see Dickerson v. Napolitano*, 604 F.3d

732, 740 (2d Cir. 2010) (same).

Once the moving party has met its burden, "the nonmoving party must come forward

with 'specific facts showing that there is a genuine issue for trial.'"   *Matsushita Elec. Indus. Co.

v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)); *see also Wright*

*v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).   The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.   *Matsushita,* 475 U.S. at 586.   Indeed, summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case."   *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).   However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   *Anderson*, 477 U.S. at 249.   Accordingly, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."   *Gallo*, 22 F.3d at 1224.

## B.    Breach of Contract

Under New York law, there are four elements to a breach of contract claim.   *DeMarle v. Videk, In*c., No. 6:22-CV-06426 EAW, 2023 WL 4138880, at *5 (W.D.N.Y. June 20, 2023). "[A] plaintiff must prove by a preponderance of the evidence, (1) the existence of a contract between itself and [the] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by [the] defendant; and (4) damages caused by [the] defendant's breach."   *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 52 (2d Cir. 2011).   The Court will address the three elements at issue in this case.

### 1.    Did an Enforceable Contract Exist?

The first issue the Court must tackle is whether a valid contract existed between the parties that obligated Stanley to continue to supply Quality with the product it needed to fulfill its obligations under the GSA contracts.   "A breach of contract claim 'that fails to allege facts

9

sufficient to show that an enforceable contract existed between the parties is subject to dismissal.'" *DeMarle,* 2023 WL 4138880, at *5 (citing *Fuji Photo Film U.S.A., Inc. v. McNulty,* 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009)).   As was indicated above, the Court has already ruled that the Letters of Supply were not stand alone contracts.   ECF No. 94.   Specifically, the undersigned previously held that "a contract which does not require performance by each party is unenforceable for lack of consideration." *Fakhoury Enterprises, Inc. v. J.T. Distributors*, No. 94 CIV. 2729 (PKL), 1997 WL 291961, at *3 (S.D.N.Y. June 2, 1997).   In this context, "[c]onsideration exists if 'something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him.'" *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 500 (S.D.N.Y. 2022) (citing *Reeves Ent. Grp. v. LBS Commc'ns Inc.,* No. 91 Civ. 0534 (CSH), 1991 WL 135476, at *6 (S.D.N.Y. July 18, 1991)).

The Letters of Supply at issue indicated, or promised, that Stanley "[could] guarantee an uninterrupted source of supply, with sufficient quantities of product, for the duration of the base contract period." Crowley Decl. Ex. J.   However, Quality was not obligated to purchase any product from Stanley.   Thus, a mutuality of obligations was lacking.   *See e.g. Howell v. United States*, 51 Fed. Cl. 516, 521 (2002) (it has long been stated in case law that the buyer must be obligated to purchase a minimum quantity in order for the agreement to be enforceable).   The Letters of Supply were also devoid of material terms needed to create an enforceable contract. *See Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 306 (S.D.N.Y. 2022) (a contract for the sale of goods must contain terms such as the quantity of goods to be sold and the price at which they will be purchased).   Specifically, there is no mention of pricing for the products, no mention of when Stanley would get paid and no agreement as to the manner

of payment stated in the Letters of Supply.

Nevertheless, as both parties reference in their submissions, the Court was concerned that Stanley may have viewed the Letters of Supply "as part of the overall" DPA.   Specifically, the Court pointed to a statement made by Bill Conaway in his September 5, 2014 letter to Quality, which stated:

> Per the terms of Stanley's [DPA] with [Quality], Stanley has the right to terminate its agreement with [Quality] by providing thirty days notice. Stanley views the previous letter of supply as being provided as part of this agreement and now desires to provide 30 days notice to terminate the authorization for [Quality] to sell Stanley products under its GSA schedule.

Crowley Decl. Ex. M.   The Court, therefore, left the door open for Quality to prove that the Letters of Supply were, in fact, part of the DPA, and that Stanley was, therefore, obligated to supply Quality with the product it needed to fulfill its obligation to the GSA.   However, the undisputed facts in this case and Quality's current arguments have closed that door.

Indeed, the parties have now clarified for the Court that "Quality's position has always been [and remains] that Stanley's Letters of Supply are not a part of the previous DPA between the parties."   Def.'s Rule 56.1 Stmt. ¶ 17.   In fact, while Quality attempts to argue, on the one hand, that the Letters of Supply cannot be viewed in a vacuum, it still insists that Stanley could not have possibly viewed the Letters of Supply as part of the DPA.   Pl.s' Mem. at 9.   Since the language on which Quality relies for its breach of contract claim is found in the Letters of Supply, and not in the DPA, this clarification, alone, is reason enough for the Court to dismiss the action for failure to allege facts sufficient to show that an enforceable contract existed between the parties.[7]

---

[7] The Court need not address Stanley's Rule 15 argument given this determination.   Nor does it need to address Quality's argument that the Letters of Supply were not terminated by virtue of the DPA termination.

11

Moreover, it is now clear to the Court that whether Stanley did or did not view the Letters of Supply as part of the DPA is somewhat irrelevant because the DPA was validly terminated before Quality suffered any alleged damages.[8]  *Id.* ¶ 11.   Quality has now admitted that the DPA could be "terminated by either party, without cause, by providing thirty (30) days written notice to the other party." *Id.* ¶ 5.   And, it acknowledges that the DPA was, in fact, validly terminated on December 4, 2015.  *Id.* ¶ 5.   Indeed, Quality's only remaining argument with respect to the DPA is that it could not be terminated with "bad faith." Yet, Quality has not provided adequate support for this assertion.   While it is true that "a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance," *see Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 98 (2d Cir. 2007), "[a] party [still] has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause." *Watermelon Plus, Inc. v. NYC Dept. of Educ.*, 76 A.D.3d 973, 974 (2d. Dept. 2010).   Accordingly, the Court finds that the only valid contract between the parties – a contract that did not govern Stanley's alleged obligation to provide Quality with an uninterrupted source of supply - was validly terminated in December 2015.[9]

### 2.      Did Stanley Breach the Contract?

The Court also finds that, even if a valid contract existed between the parties, Stanley did not commit a breach because neither it, nor Dormakaba, ever refused to supply Quality with merchandise.   Def.'s Rule 56.1 Stmt. ¶¶ 29, 32; Crowley Decl. Ex. R, 29:8-30:22, 156:8-24, 159:2-15, 161:16-20.   Notably, Quality argued in the earlier motion that Stanley's conduct had interfered with its ability to fulfill its government contracts.   This left the Court with the

---

[8] Quality's expert report calculates damages beginning on January 1, 2016, a few weeks after the DPA was terminated.   Crowley Decl. Ex. K, ECF No. 174.

[9] This also negates any claim based on Stanley's failure to assign the Letters of Supply to Dormakaba since the sale occurred a year after the DPA had been terminated.

impression that after a certain point in time Stanley products were unavailable to Quality.   In fact, Quality continues to broadly assert that Stanley could not fulfill its obligation to Quality because it sold the business to Dormakaba.   However, during a court conference more than three years after the Court had issued the first summary judgment decision, Quality finally clarified that it could always obtain Stanley products and simply chose not to do so because it was no longer receiving discounted pricing.   Indeed, as evidence of that fact, Quality produced invoices during discovery reflecting that it purchased product from Stanley even after the lawsuit had been filed.   Crowley Decl. Ex. N.   Dinardo also confirmed at his deposition that he never "reached out to Dormakaba to open an account." *Id*. Ex. R at 31:24-32:22, 158-61.

As such, Quality's claim, which the Court now understands to be based on Stanley's refusal to provide continued discounts, is startling given the fact that Stanley reserved the right to change its prices at any time.   In particular, Section 1.7 of the DPA states:

> Stanley may, in its sole discretion, change or amend the discounted prices established by Stanley; add products to or remove products from, and/or change or amend terms and conditions of sale as contained in, its catalogs, price list or published sales policies; or publish a revised price list, catalog or sales policy from time to time.

Crowley Decl. Ex. D; Def.'s Rule 56.1 Stmt. ¶¶ 6, 8.   Accordingly, there is no evidence upon which a reasonable jury could find that Stanley breached the parties' agreement to the extent one exists.

### 3.   Has Quality Established that Stanley's Breach Resulted in Damages?

Finally, it warrants mention that Quality has also failed to present evidence to support another essential element of a breach of contract claim, namely, damages resulting from the alleged breach.   To begin with, the DPA contains explicit language barring the recovery of lost profits.   Specifically, Section 5.4 provides:

> It is expressly agreed that under no circumstances shall Stanley be held liable for any incidental, special or consequential damages, including, but not limited to, loss of profits, whether arising under alleged breach of Agreement, negligence, strict liability, or any other legal or equitable theory.

Crowley Decl. Ex. D.   As the Appellate Division, First Department, noted in *Daily News, L.P. v. Rockwell Int'l Corp.*, 256 A.D.2d 13, 680 N.Y.S.2d 510 (1998), a breach of contract claim seeking consequential damages should be dismissed where the parties' contract limits the remedies available thereunder and expressly excludes as a remedy the recovery of consequential damages as long as there has been no showing of unconscionability.[10]

Second, Quality's damages calculation is completely speculative.   "In New York, a party is entitled to recover . . . lost profits [on collateral business arrangements] only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Tractebel Energy Mktg., Inc.*, 487 F.3d at 109.   Quality's expert, Glenn Liebman, CPA/ABV, prepared a damages report on Quality's behalf that calculates alleged lost profits from January 1, 2016, the month after the DPA was terminated, through December 31, 2034.   Clearly, this calculation simply assumes that the GSA contracts, which were subject to renewal every 5 years, were going to be continued without interruption and that the government was going to order goods through 2034.   *See* 19-4574, ECF No. 1 ("Plaintiff's GSA Contract is a twenty-year contract renewable every 5 years unless otherwise terminated.").   Liebman also assumed a 50% gross profit rate based on Quality's 2014 through 2021 income tax returns and made no attempt to distinguish the profit rate of Quality's GSA sales from its commercial sales.   Def.'s Rule 56.1 Stmt. ¶ 43.   In deriving his projected

---

[10]  It is because of this unambiguous clause that Quality maintains to date that the Letters of Supply were never part of the DPA and thus not subject to this exclusion.

lost profits, Liebman further assumed that Quality's future growth rate in government sales would be similar to that of Stanley Convergent Security Solutions ("Stanley Convergent"), a multi-billion-dollar international corporation that does not sell the same types of products as Quality.   *Id*. ¶¶ 44-9.

Finally, the Court would be remiss if it failed to mention Quality's failure to produce any records related to its purchase and resale through the GSA of Stanley product acquired from other sources, such as wholesalers, beyond the year 2015.   Dinardo testified at his deposition that following the termination of the DPA, Quality bought Stanley products from a wholesale distributor as well as substitution products and then sold them under its GSA contracts.   *See* Bojbasa Decl. Ex. D at 24, 27, 158-160.   Indeed, according to the GSA Advantage website, Quality was still selling Stanley products for sale under its GSA contract after the termination of the DPA.   *Id.* Ex. E.   Yet, Quality failed to provide any records of those sales, which would have served to mitigate its alleged failure to purchase Stanley product directly from Stanley. Quality asserts that it could not deduce these sales from its own records because it did not maintain individual purchase/sale documents in a manner that would enable it to locate or produce those sales records.   Stanley disputes this contention.   However, in any case, Quality's failure to produce their relevant sales records despite seeking damages through 2034 adds to the speculative nature of their damages claim.

## CONCLUSION

For the foregoing reasons, Stanley's motion for summary judgment is granted.   The Clerk of the Court is directed to close this case.

Dated:   Central Islip, New York
      April 19, 2024

**SO ORDERED:**
_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge